## Case No. 12,517.

### In re SCOTT.

[1 Abb. U. S. 336;[1] 3 N. B. R. 742 (Quarto, 181); 9 Am. Law Reg. (N. S.) 349; 18 Pittsb. Leg. J. 53; 12 Int. Rev. Rec. 129; 2 Chi. Leg. News, 398.]

District Court, N. D. Ohio. 1869.[2]

BANKRUPTCY—PRIORITY OF LIENS ON VESSELS.

1. Courts of bankruptcy will, in general, give effect to liens according to priority of date.

2. Maritime liens, which by the law of the admiralty would take precedence over charges of an earlier date, may, however, be accorded a similar preference in a court of bankruptcy.

3. A lien for supplies, &c., furnished to a vessel, founded upon a state statute, and not of a strictly maritime character, may be recognized and enforced in a court of bankruptcy; but it cannot relate back, as a maritime lien may do, so as to take priority over a mortgage recorded prior to the creation of such lien.

[Cited in note in Francis v. The Harrison, Case No. 5,038. Disapproved in The William T. Graves, Id. 17,759. Cited in Moir v. The Dubuque, Id. 9,696; Baldwin v. The Bradish Johnson, Id. 798.]

Exceptions to the report of a commissioner in bankruptcy.

In 1867, Dwight Scott was the sole owner of two propellers, the S. D. Caldwell and the Ironsides. In June, 1868, both vessels were libeled, at Cleveland, for debts which were liens; and they were sold by order of the district court. Previous to the sale of them, Scott filed a petition in bankruptcy and was adjudged a bankrupt. After the sale of the vessels, the demands upon which the libels were founded, were paid out of the proceeds, and the balance was paid over to the assignee in bankruptcy. Motions were then made in the proceedings in bankruptcy to distribute these proceeds among the different lienholders; and the case was referred to a special commissioner to report on the claims and their priorities. The cause now came before the court upon exceptions to the report of the commissioner. The principal question made was, upon the relative priority of claims arising upon mortgages upon the vessels, and claims for supplies, &c. furnished under the "watercraft law" of the state of Ohio.

Willey & Cary, for mortgagees.

R. P. Ranney, S. Williamson, Mr. Backus, Estep & Burke, J. T. Carran, S. O. Griswold, and Mr. Wyman, for various claimants under the watercraft law.

SHERMAN, District Judge. Under the bankrupt law the court is bound to recognize and enforce all valid liens; and the estate of the bankrupt passes to the assignee, subject to all liens that were subsisting upon it or its proceeds. The inquiry is therefore a proper one: What were the valid and subsisting liens, and their order, at the time the proceeds came into the hands of the assignee? From the character of the claims presented,

and the difficult questions of priority arising in the cases, on application of the parties the motions were referred to J. D. Cleveland, Esq., as special commissioner, to inquire into, and report upon the various claims and liens presented, and the order of their priority. The commissioner in the discharge of his duty made an able and elaborate report on the various questions submitted to him, which, from its fullness and general accuracy, has certainly entitled him to great credit.

From that report and the proof it appears that the propellers Caldwell and Ironsides, one of eight hundred tons, and the other of twelve hundred tons, were both enrolled and licensed at the custom-house of the Cuyahoga district, where Dwight Scott, the owner, resided, and were both engaged in commerce and navigation between Cleveland and other lake ports in different states, during the whole time, between the accruing of the earliest lien and the time they were seized, libeled and sold.

There were three classes of liens set up against the proceeds:

1st. Strictly maritime liens, such as seamen's wages, materials, supplies and repairs in ports of other states, for damages for collision, and for towage and wharfage in foreign ports. There was no question as to the validity and priority of these liens, and under former orders of the court they have been paid.

2nd. Statutory Liens.—That is, claims for supplies, materials, &c. which the laws of Ohio declare shall be liens upon vessels navigating the waters in, or bordering upon the state, and that they shall at once attach upon the accruing of the debt.

3rd. Mortgage Liens.—A mortgage on each propeller was given by Dwight Scott, the owner, in part, for the purchase money, and the mortgages were duly recorded according to the act of congress of July 29, 1850 [9 Stat. 440], in the district of Cuyahoga, the home port of the vessels.

The question presented is, as to the priority of the statutory liens and the liens of the mortgages.

If the so-called "watercraft laws" of Ohio attached to these propellers, and had the force and effect that from their terms they were intended to have by the legislature, then unquestionably the statutory liens will have the preference. Authorities are cited, both in the federal and state courts, to the effect that this class of liens should be recognized and declared valid, to take effect next after purely maritime liens. But on an examination of these authorities, I am satisfied that these liens were so recognized, by reason of the provisions of the act of congress of February 26, 1845 (5 Stat. 726), which reserved concurrent remedies, as given by the state laws, in proceedings against vessels navigating the western waters. Under that law, this class of claims was treated as a species of maritime liens, only inferior in their nature and

[1] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

[2] [Affirmed in Case No. 7,070.]

precedence to liens allowed by the maritime law. Even the supreme court, about that time, under the power conferred upon it by congress to prescribe forms and process, made the twelfth rule in admiralty, which provided that this class of claims, depending upon state statutes, might be enforced by proceedings in rem in the district court, as a court of admiralty. This rule was, however, afterwards repealed, but for reasons other than want of jurisdiction. The St. Lawrence, 1 Black [66 U. S.] 522.

Previous to the act of 1845, the opinion was entertained and frequently asserted that the admiralty jurisdiction of the federal courts did not extend beyond the ebb and flow of the tide, and therefore state laws and state courts governed and controlled all matters in controversy arising on the western lakes and rivers. The Thomas Jefferson, 10 Wheat. [23 U. S.] 428; The Orleans v. Phœbus, 11 Pet. [36 U. S.] 175; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344. In view of the vast and rapid increase of commerce on those waters, the act of 1845 was passed, conferring admiralty jurisdiction on the district court as to claims against vessels navigating the lakes and waters connecting them, saving, however, to the parties, whatever concurrent remedy the common law might give them, and also such remedies as may be given by the laws of the states. Under this law, and with the ideas then universally prevailing, the doctrine grew up that the state laws could create and establish liens upon that description of property. However, as time progressed, and the want of uniformity and consistency in the state laws became manifest, the subject of jurisdiction over vessels navigating the lakes received more attention, and was more closely investigated. From the time of the case of The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 443, 459, down to the cases of The Moses Taylor, 4 Wall. [71 U. S.] 411; The Hine v. Trevor, Id. 555; and The Belfast, 7 Wall. [74 U. S.] 624, the opinion has been growing that the district court did not derive its admiralty jurisdiction over the western waters by reason of the act of 1845, but that it was always possessed under section 9 of the judiciary act of 1789 [1 Stat. 76]. Finally, these doubts and opinions were settled at the late session of the supreme court, by a decision pronounced by Judge Nelson, in the case of The Eagle, 8 Wall. [75 U. S.] 15, to the effect that the act of 1845 was obsolete and of no effect, and that general jurisdiction in admiralty upon the lakes was conferred upon the district courts by the judiciary act of 1789.

It follows, as the result of that decision, that if admiralty jurisdiction was conferred upon the district courts by the original judiciary act, it is an exclusive jurisdiction, and that the state laws cannot create, upon property that is subject exclusively to admiralty laws, charges and incumbrances that in any way partake of the character and force of maritime liens, that might be superior to other charges or incumbrances of an older date. This opinion, so well considered, and so much in harmony, as it is, with the rulings of all the district courts along the lakes for years past, is decisive of the nature and character of these claims, and the force, and priority and effect, that will hereafter be given them in the courts.

In this connection, I may cite the decision of the supreme court of Ohio, in a very late case, of The General Buell v. Long. 18 Ohio St. 521, recognizing the principles laid down in the Moses Taylor and the Belfast Cases, and adopting them as the latest and most authoritative law on this subject. Similar cases, involving similar principles, have lately been decided in New York,—Bird v. The Josephine, 39 N. Y. 19; in Minnesota,—Griswold v. The Otter, 12 Minn. 465 (Gil. 364); in Indiana,—Ballard v. Wiltshire, 28 Ind. 341; and in Kentucky,—Stewart v. Harry, 3 Bush, 438.

The judiciary act of 1789 saves to the parties all the concurrent remedies of the common law. The lien which the statutes of Ohio declare that these domestic claims shall have, is not a common law lien or remedy. It is the creation of the statutes. The state of Ohio, as between her own citizens, and upon property within her jurisdiction, has the authority to declare what claims or indebtedness shall or shall not be liens, and the force and effect of those liens upon property. She has by her statutes declared that the class of claims now in question shall be liens, and shall at once attach upon the property, at the time of the creation of the debt. This court, as a bankrupt court, recognizes these statutes, and would be governed by them as far as possible, in the disposition of the proceeds of property sold in the hands of an assignee. And if the question before the court was, whether these claims had a preference over a mortgage of a prior date executed and recorded according to the laws of Ohio, or over any other debt against Dwight Scott, the bankrupt, even if it were in judgment and execution levied on the propellers previous to the accruing of their claims, the court might order the payment of them out of their proceeds, before the mortgage and judgment were paid. It would do so, if the statute or the decisions under it had made them the first lien, for the state has full authority to discriminate by law and create preferable liens upon property, so far as these liens are created or given validity to by the state legislation. But the mortgages on these propellers were of prior date to any of these domestic claims. They are both dated and recorded in April, 1867. The claims bear date at different times from May, 1867, to May, 1868. The mortgages are both recorded in pursuance of the act of congress of July 29, 1850, which provides substantially that no mortgage of a vessel shall be valid against any person, except the mortgagor and his representatives, unless such mortgage shall be recorded in the office of the collector of cus-

toms, in the district where the vessel is registered or enrolled. By virtue of the mortgage, the mortgagees acquired a lien on the vessels to the amount named in them, and by the recording of them, they gave notice to the world, including these claimants, that such a lien existed. The mortgages are no more a maritime lien than these domestic claims are. The mortgages and claims are of equal validity, and both were a charge and lien upon the propellers, to be paid according to their priority of date. If the claims had been of a prior date to the mortgages, they would have had a preference, and been paid first out of the proceeds of the sale; but as they happened to be of subsequent date, they must give way to the mortgages.

That congress has the power to give validity to mortgages on vessels, by authorizing their record in the office of the collector of the customs in the home port, has been repeatedly settled. Under the power given in the constitution to regulate commerce, congress having created, as it were, this species of property, and conferred upon it its chief value, there can be no reason why that power should not be extended to the security and protection of the rights and title of all persons dealing therein. Blanchard v. The Martha Washington [Case No. 1,513]; White's Bank v. Smith, 7 Wall. [74 U. S.] 646.

The conclusion I have arrived at may seem to be in conflict with the decisions in Kellogg v. Brennan, 14 Ohio, 72, and Provost v. Wilcox, 17 Ohio, 359, wherein it is held that the claims of creditors for supplies and materials to a vessel, are, under the watercraft laws of Ohio, to be preferred as against a mortgage. These decisions were made in 1846 and 1848, and previous to the act of congress of July, 1850, and the question in those cases was between the domestic lienholders, and a mortgage executed and recorded under the state statutes. It was, therefore, a different question from the one presented in this case, and in view of their late decision in the case of The General Buell v. Long, supra, there can be no doubt but that that court would arrive at the same conclusion I have done.

Let an order be entered, and distribution made according to the principles herein laid down.

[The decision in this case involves a fund of about thirty thousand dollars.] [3]

